Case 1:24-cv-00024 Document 19 Filed on 09/18/24 in TXSD Page 1 of 14

United States District Court
Southern District of Texas
**ENTERED**
September 18, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DR. KARL GOODKIN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 1:24-CV-024 |
| | § | |
| UNIVERSITY OF TEXAS RIO GRANDE VALLEY, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## ORDER AND OPINION

Plaintiff Dr. Karl Goodkin brings this lawsuit against Defendant University of Texas – Rio Grande Valley ("UTRGV") and one of its professors, Dr. Diana Chapa. Goodkin alleges that in 2023, after UTRGV had named him Chair of the Department of Psychiatry, Chapa engaged in a campaign to spread false information about Goodkin's job performance, leading to his demotion. Chapa then secured the Chair position, and UTRGV proceeded to reduce Goodkin's pay and prohibited him from conducting research and performing other aspects of his job. As a result, he resigned.

Goodkin alleges that racial and gender bias motivated UTRGV and Chapa. He brings discrimination claims against UTRGV under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, and defamation claims against Chapa under Texas state law. (2nd Am. Compl., Doc. 13)[1]

Defendants move to dismiss Goodkin's causes of action, contesting subject-matter jurisdiction under Federal Rules of Civil Procedure 12(b)(1), and arguing under Rule 12(b)(6) that Goodkin fails to present a claim upon which relief can be granted. (Motion, Doc. 14) For the following reasons, the Court concludes that Goodkin's causes of action based on federal law do

---

[1] Initially, Goodkin also alleged a claim for detrimental reliance, but he withdrew that cause of action in his Second Amended Complaint.

not survive the Motion to Dismiss, but declines to exercise supplemental jurisdiction to reach the arguments concerning Goodkin's causes of action based on Texas state law.

I. **Plaintiff's Allegations and Procedural History**[2]

In January 2023, UTRGV hired Goodkin as Chair of the Department of Psychiatry at UTRGV's School of Medicine. (2nd Am. Compl., Doc. 13, ¶ 5)  Upon commencement of his employment, UTRGV offered Goodkin an initial term of two years, with allotted time to continue clinical research for a protocol he developed in an AIDS Clinical Trials Group ("AIDS Trials"). (*Id.*)

Within the first few months of Goodkin's employment, Dr. Diana Chapa, a professor at UTRGV and a rival for the Chair position, expressed frustrations to her colleagues about the hiring of a non-Latino male as Chair. (*Id.* at ¶ 8–9)  Goodkin is Caucasian, while Chapa is Hispanic.

Chapa also complained about the decision to the Dean of the School of Medicine, Michael Hocker.  Chapa even threatened to resign from her position at UTRGV. (*Id.* at ¶¶ 9–10)

Instead of resigning, however, in April 2023, Chapa "began a campaign against Goodkin to get him removed, including making false claims about his performance, and recruiting other Hispanic females to her cause." (*Id.* at ¶ 10)  Examples of the allegedly false claims included that Goodkin failed to meet with members of the department, that he failed to communicate the vision of the department or the roles and responsibilities of its leadership team, and that his poor management of the residency training program had led to a formal complaint. (*Id.*)  "The false claims by Chapa ultimately were reported" to Hocker. (*Id.* at ¶ 11)

"[G]iven the community that UTRGV serves," Hocker had concerns about the false claims that "Hispanic/Latina female individuals" had presented. (*Id.*)  As a result, "without doing any proper investigation," Hocker "removed Goodkin from his Psychiatry Chair position, and replaced him with Chapa, as the false claims of the Hispanic/Latina employees carried more weight than

---

[2] For purposes of considering a motion to dismiss under Rule 12(b)(6), a court accepts a plaintiff's well-pleaded allegations as true but does not accept as true legal conclusions couched as factual allegations. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007).

the truths of Caucasian employees." (*Id.*) According to Goodkin, if he had been a Hispanic/Latina female, Hocker would have conducted a more detailed investigation and ultimately not demoted Goodkin. (*Id.*) Even after the demotion, Hocker "failed/refused to even allow Goodkin to avail himself appropriately of the UTRGV grievance procedures or to respond to his request to do so." (*Id.* at ¶ 12) Hocker also took other steps prejudicial to Goodkin, such as not approving reimbursement requests and interfering with payments for the AIDS Trials. (*Id.*)

Goodkin continued with UTRGV as a faculty professor, albeit at half of his previous salary. (*Id.* at ¶ 13) In May, UTRGV removed his ability to conduct research, preventing him from meeting the compliance requirements for the AIDS Trials that he ran and that NIH funded. (*Id.*) "At that point, race and gender discrimination had become evident, and after enduring the constant harassment and the inability to perform the job he was tasked to do, and required to do, Goodkin was forced to resign." (*Id.*)

About a month after his resignation, Goodkin filed a Charge of Discrimination with the Equal Employment Opportunity Commission and the Texas Workforce Commission—Civil Rights Division, alleging "race discrimination, gender discrimination and retaliation by UTRGV." (*Id.* at ¶ 18) In March 2024, the United States Department of Justice issued a Notice of Right to Sue. (*Id.*) This lawsuit followed.

## II.   Analysis

Goodkin alleges that UTRGV discriminated against him based on his race and gender, in violation of Title VII and Section 1981. This discriminatory conduct, which he alleges created a hostile work environment and subjected him to disparate treatment, led to his demotion and ultimately to his constructive discharge. He also advances causes of action against Chapa for defamation and defamation *per se*, under Texas law.

UTRGV and Chapa challenge all of Goodkin's claims. UTRGV argues that Goodkin fails to plead a viable cause of action for hostile work environment or disparate treatment. And Chapa contends that Goodkin cannot sue her in her individual capacity under Title VII. As to the

defamation claims, she asserts immunity to suit as an employee of a state agency, and also argues that Goodkin fails to allege a viable claim.

### A. Standard of Review

#### 1. Rule 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), a trial court must dismiss an action for lack of subject matter jurisdiction when the court is without the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). The party seeking the federal forum bears the burden of proving federal jurisdiction. That party bears the burden of establishing facts supporting jurisdiction by a preponderance of the evidence. *Vantage Trailers, Inc. v. Beall Corp.*, 567 F.3d 745, 748 (5th Cir. 2009); *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998).

"[I]f the defense merely files a Rule 12(b)(1) motion, the trial court is required merely to look to the sufficiency of the allegations in the complaint because they are presumed to be true." *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). When a Rule 12(b)(1) motion is filed alongside other Rule 12 motions, "the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). In determining whether jurisdiction exists, a court may consider: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the Court's resolution of disputed facts." *Id*.

#### 2. Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); FED. R. CIV. P. 12(b)(6). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff's complaint need not contain detailed factual allegations, but it must set forth "more than

labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. A court considers only the well-pleaded allegations in the complaint and must accept them as true, viewing them in the light most favorable to the plaintiff. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). These allegations "must be enough to raise a right to relief above the speculative level". *Twombly*, 550 U.S. at 555. "Conclusory allegations and unwarranted deductions of fact are not admitted as true, especially when such conclusions are contradicted by facts disclosed by a document appended to the complaint." *Carter v. Target Corp.*, 541 F. App'x 413, 417 (5th Cir. 2013) (quoting *Associated Builders, Inc. v. Ala. Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974)); *see also Residents Against Flooding v. Reinvestment Zone No. Seventeen, City of Houston, Tex.*, 260 F. Supp. 3d 738, 757 (S.D. Tex. 2017), *aff'd sub nom. Residents Against Flooding v. Reinvestment Zone No. Seventeen*, 734 F. App'x 916 (5th Cir. 2018).

### B. Causes of Action against UTRGV

Goodkin bases his claims against UTRGV on Title VII and Section 1981. When considering causes of action for racial and gender discrimination under these provisions, courts apply the same analysis. *See Johnson v. Halstead*, 916 F.3d 410, 420 (5th Cir. 2019).

The controlling statutes render it an unlawful employment practice for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Goodkin alleges that UTRGV discriminated against him by subjecting him to disparate treatment and a hostile work environment because of his gender and race.

#### 1. Disparate Treatment

According to Goodkin, UTRGV's conduct subjected him to disparate treatment. To succeed on this claim, he must show that (1) he is a member of a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; (4) he was replaced

by someone outside the protected group or was treated less favorably than other similarly situated employees outside the protected group. *See Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 339 (5th Cir. 2021).

UTRGV attacks this claim on two fronts. First, UTRGV asserts that Goodkin fails to allege that any allegedly-wrongful conduct was "due to any discriminatory intent." (Motion, Doc. 14, 12) Second, the university argues that Goodkin "simply fails to identify the requisite 'similarly situated' comparator". (*Id.*)

At the motion-to-dismiss stage, Goodkin need not establish a *prima facia* case. Rather, "he [must] plead sufficient facts on all of the ultimate elements of a disparate treatment claim to make his case plausible." *Olivarez v. T-mobile USA, Inc.*, 997 F.3d 595, 600 (5th Cir. 2021) (quoting *Chhim v. Univ. of Texas at Austin*, 836 F.3d 467, 470 (5th Cir. 2016)). Those ultimate elements include: "(1) an adverse employment action, (2) taken against a plaintiff because of her protected status." *Olivarez*, 997 F.3d at 600 (quoting *Cicalese v. Univ. of Texas Med. Branch*, 924 F.3d 762, 767 (5th Cir. 2019)). As applied in this case, Goodkin must allege sufficient facts, when accepted as true, that show that UTRGV took an adverse employment action against him "'*because of* [his] protected status.'" *Cicalese*, 924 F.3d at 767 (quoting *Raj v. La. State Univ.*, 714 F.3d 322, 331 (5th Cir. 2013)).

Employees "can prove discriminatory motive through either direct or circumstantial evidence." *Cicalese*, 924 F.3d at 765. Direct evidence is "evidence which, if believed, proves the fact [of intentional discrimination] without inference or presumption." *Brown v. East Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993). Such evidence includes, for example, "any statement or written document showing a discriminatory motive on its face." *Portis v. First Nat. Bank of New Albany, Miss.*, 34 F.3d 325, 329 (5th Cir. 1994). Circumstantial evidence requires an inference to prove a fact. The distinction makes a difference at the Rule 12 stage. Normally, an employee need not submit evidence to establish a prima facia case of discrimination under the *McDonnell Douglas* framework. But "when a complaint purports to allege a case of circumstantial

evidence of discrimination, it may be helpful to refer to *McDonnel Douglas* to understand whether a plaintiff has sufficiently pleaded an adverse employment action taken 'because of' his protected status". *Olivarez*, 997 F.3d at 600; *see also Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2002) ("[T]he prima facie case relates to the employee's burden of presenting evidence that raises an inference of discrimination.").

Goodkin's Second Amended Complaint includes no allegations that would constitute direct evidence. Instead, his allegations, if proven, would amount to circumstantial evidence demonstrating the required discriminatory motive. As a result, the Court can refer to the *McDonnell Douglas* framework to understand whether Goodkin's allegations, taken as true, demonstrate the requisite link between Goodkin's race or gender and the adverse employment action.

### a. Discriminatory Intent

Goodkin alleges two adverse employment actions. First, he claims that Hocker demoted him, and did so "without doing any proper investigation" of the job-performance complaints submitted against Goodkin. (2nd Am. Compl., Doc. 13, ¶ 11) According to Goodkin, Hocker took this action because "the false claims of the Hispanic/Latina employees carried more weight than the truths of Caucasian employees." (*Id.*) He continues by alleging that had he been "a Hispanic/Latina female, a more detailed investigation would have taken place, and [he] would not have been removed from his position." (*Id.*) He alleges that even after the demotion, Hocker engaged in other actions against Goodkin, such as refusing to allow him "to avail himself appropriately of the UTRGV grievance procedures or to respond to his request to do so". (*Id.* at ¶ 12) He also suffered a 50% decrease in pay from the demotion. (*Id.* at ¶ 13)

Second, Goodkin alleges a constructive discharge. After his demotion, when Chapa assumed the Chair role and supervised Goodkin, "UTRGV removed [his] ability to do research, which prevented him from complying with the requirements of the AIDS Trials ultimately being funded by the NIH." (*Id.*) "At that point, race and gender discrimination had become evident,

and after enduring the constant harassment and the inability to perform the job he was tasked to do, and required to do, Goodkin was forced to resign". (*Id.*)

The Court will consider each alleged adverse employment action in turn, determining whether Goodkin's allegations satisfy the second ultimate element–i.e., that UTRGV engaged in the wrongful action "because of" Goodkin's race or gender.

As to the demotion, Goodkin fails to allege that Hocker made the decision based on a protected status. Goodkin's allegations focus on the alleged beliefs and actions of his co-workers and subordinates, principally Chapa. According to Goodkin, Chapa voiced frustration over UTRGV hiring a non-Latino male as Chair of the Department of Psychiatry. She engaged in a campaign against him, including spreading false statements about his job performance that eventually reached Hocker. But the most that Goodkin alleges about Hocker is that he "was concerned about the false claims being made by Chapa, and other Hispanic/Latina female individuals, given the community that UTRGV serves."[3] (*Id.* at ¶ 11) These allegations, however, are not enough. It is axiomatic that the Dean of the School of Medicine should be "concerned about" claims regarding a Department Chair's job performance. *Cf. Olivarez*, 997 F.3d at 598 (explaining that the discharge of an employee who took excessive leave was "not discrimination– that is ordinary business practice"). Goodkin must allege more than Hocker being concerned about the work-performance complaints. He never alleges, for example, that Hocker knew the complaints were false, or that he accepted those complaints' truths *because* Goodkin was Caucasian or male. Rather, the only reasonable inference from the allegations is that Hocker received complaints about Goodkin's job performance and, based on those complaints, demoted him.

---

[3] In its Motion, UTRGV references letters from Hocker to Goodkin about the latter's job performance. (*See* Motion, Doc. 14, 3) At the motion to dismiss stage, however, the Court cannot go beyond Goodkin's allegations and must accept all well-pleaded allegations as true.

The Court recognizes that Goodkin also alleges that "[i]t is clear that had Goodkin been a Hispanic/Latina female, a more detailed investigation would have taken place, and Goodkin would not have been removed from his position." (2nd Am. Compl., Doc. 13, ¶ 11) This allegation, however, is conclusory; beginning the sentence with "it is clear" does not render it so. Goodkin bears the burden to allege facts supporting the statement, such as examples of non-caucasian males who received a robust investigation after employees complained of their job performance. Goodkin's Second Amended Complaint contains no such factual allegations. As a result, the Court finds that Goodkin fails to properly allege that UTRGV demoted him *because of* his race or gender.

In responding to the Defendants' motion, Goodkin relies on *Cicalese v. Univ. of Texas Med. Branch*, 924 F.3d 762, 767 (5th Cir. 2019). But his reliance is misplaced. In that case, a married couple born in Italy and who worked as professors in the United States alleged that the defendant university discriminated against them based on their national origin. After the district court dismissed their claims under Rule 12(b)(6), the couple appealed. The Fifth Circuit reversed, focusing on the plaintiff's allegations of specific statements suggesting an anti-Italian sentiment, such as the Dean telling them, "You should go back to Italy." *Id.* at 764. While the district court considered the alleged statements to be "stray remarks", the Fifth Circuit disagreed, reasoning that whether the derogatory statements constituted mere "stray remarks" "was more suited to the summary judgment phase." *Id.* at 768.

Goodkin argues that in a similar fashion, the Court should allow the current matter to proceed to discovery. The Court disagrees. In contrast to the plaintiffs in *Cicalese*, Goodkin includes no allegations that Hocker made or heard any race- or gender-based statements. Goodkin may subjectively believe that Hocker acted with the required discriminatory motive, but he alleges no facts that, if proven true, would support the truth of such a belief. Under these circumstances, Goodkin presents no claim upon which relief could be granted.

Turning to the claim of constructive discharge, Goodkin alleges that following his demotion, UTRGV cut his pay and removed his ability to conduct research, preventing him from

meeting the funding requirements for the AIDS Trials that he oversaw. (2nd Am. Compl., Doc. 13, ¶ 13) As a result, he resigned. These allegations, however, suffer from the same deficiencies as his claims based on his demotion. Goodkin alleges that UTRGV prevented him from doing research and cut his pay. But he offers no well-pleaded allegation that UTRGV took these actions based on Goodkin's race or gender. At most, he alleges that Chapa desired this outcome. But he never alleges that Chapa communicated any race- or gender-based statements to a decision maker at UTRGV, or that Chapa controlled UTRGV's decisions regarding Goodkin's pay and research abilities.[4] In essence, even accepting that Chapa desired that a Hispanic female chair the Department of Psychiatry, and that she spread false information about Goodkin's job performance, Goodkin alleges no facts connecting Chapa's beliefs to UTRGV's decisions that affected Goodkin's position. As a result, Goodkin fails to allege that the university acted with the required discriminatory intent when making the decisions that Goodkin alleges forced him to resign.[5]

### 2. Hostile Work Environment

UTRGV also challenges Goodkin's hostile work environment claim on the grounds that he fails "entirely to plead any facts showing a pattern of racial or sexual harassment against white male employees such as himself", and merely relies on alleged complaints by Chapa and others that "were entirely related to [Goodkin's] deficient job performance". (Motion, Doc. 14, 12) Based on the allegations within the Second Amended Complaint, the Court agrees that Goodkin fails to present a viable claim for hostile work environment.

An employee can advance a claim for hostile work environment by demonstrating that he was "sexually or racially harassed in violation of Title VII" and "that the harassment created a hostile or abusive working environment". *Johnson v. Bd. of Supervisors of Louisiana State Univ.*

---

[4] The Second Amended Complaint leaves unclear who at UTRGV made the decision to reduce Goodkin's salary or remove his ability to conduct research.
[5] In light of the analysis in this section, the Court need not address the Defendants' arguments that Goodkin fails to identify a similarly situated employee.

*& Agric. & Mech. Coll.*, 90 F.4th 449, 455 (5th Cir. 2024) (quoting *Harvell v. Westward Commc'ns, LLC*, 433 F.3d 428, 434 (5th Cir. 2005)). A hostile work environment exists when (1) an employee who belongs to a protected group; (2) was subjected to unwelcome sexual or racial harassment; (3) which was based on his membership in the protected group; (4) which affected a term, condition, or privilege of employment; and (5) which the employer knew or should have known about and failed to take prompt remedial action. *See Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 399–400 (5th Cir. 2021); *see also Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002).

Under this legal theory, the employee must show that "the workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create a hostile or abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). The alleged harassment must be both subjectively and objectively offensive. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). Courts consider "the totality of the circumstances", including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris*, 510 U.S. at 21). Criticism of an employee's work-related performance typically proves insufficient to establish a hostile work environment claim. *See Kang v. Board of Supervisors of La. State Univ.*, 75 F.App'x 974, 976 (5th Cir. 2003) (unpublished) (involving a hostile work environment claim based on the plaintiff receiving a poor performance evaluation, being "written up" for work performance, receiving a less-than-average pay raise, not being nominated for a teaching award, and being "unfairly and unjustly" criticized by his supervisor in an office meeting: "The actions that Kang complains of, while potentially inappropriate, do not satisfy [the hostile work environment] standard.").

In the present matter, Goodkin alleges that he "endur[ed] the constant harassment and the inability to perform the job he was tasked . . . and required to do". (2nd Am. Compl., Doc. 13,

¶ 13) But aside from this conclusory statement, he alleges no conduct of the type that typically forms the basis of a hostile work environment claim. For example, he alleges no comments or conduct that physically threatened or humiliated him. He mentions no offensive utterances or conduct demeaning of him. He recites no abusive language, gender- or race-based jokes, or even occasional teasing. On the contrary, the only allegedly wrongful behavior by UTRGV employees concerned complaints about Goodkin's work performance. In particular, Goodkin alleges that "Chapa began a campaign against [him] to get him removed, including making false claims about his performance, and recruiting other Hispanic females to her cause." (*Id.* at ¶ 10) Goodkin recites a list of the "intentionally untruthful/false claims" that Chapa allegedly made, but they all concern his job performance as Chair, such as failing to meet with core psychiatry faculty or sharing his vision with the faculty, or that other employees had resigned because of Goodkin. ( *Id.*) Such comments, accepting them as falsely made, cannot form the basis of a hostile work environment claim.

For these reasons, Goodkin's cause of action based on an alleged hostile work environment does not survive the Defendants' motion under Rule 12(b)(6).

### C. Defamation and Defamation *Per Se* Claims as to Chapa

Goodkin advances causes of actions against Chapa, in her individual capacity, for defamation and defamation *per se* under Texas state law. (*Id.* at ¶¶ 32–35) In seeking dismissal of these claims, Chapa invokes sovereign immunity under the Texas Tort Claims Act. (Motion, Doc. 14, 14–20 (citing Tex. Civ. Prac. & Rem. Code §§ 101.106(e), 101.106(f), 101.057(d))) For the following reasons, the Court declines to reach this issue.

When a federal district court possesses original jurisdiction over a federal claim pursuant to 28 U.S.C. § 1331, the court may exercise supplemental jurisdiction over state law claims "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, upon dismissal of the federal claims that served as the basis for original jurisdiction,

the district court may decline to exercise supplemental jurisdiction over the remaining claims under state law. 28 U.S.C. § 1367(c)(3); *see The Lamar Co., LLC v. Miss. Transp. Comm'n*, 976 F.3d 524, 528 (5th Cir. 2020) (citing *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009)). "A district court's decision whether to exercise [supplemental jurisdiction over specified state-law claims] after dismissing every claim over which it had original jurisdiction is purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635 (2009) (emphasizing the word "may" in 28 U.S.C. § 1367(c)).

The Fifth Circuit has adopted a "general rule" that district courts "decline to exercise jurisdiction over pendent state-law claims when all federal claims are dismissed", but "this rule is neither mandatory nor absolute." *Batiste v. Island Recs. Inc.*, 179 F.3d 217, 227 (5th Cir. 1999). In addition to the statutory factors of Section 1367(c), courts also consider "the common law factors of judicial economy, convenience, fairness, and comity." *Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.*, 554 F.3d 595, 602 (5th Cir. 2009) (citing *Mendoza v. Murphy*, 532 F.3d 342, 346 (5th Cir. 2008)).

Turning to the present matter, the Court observes that the case remains in its initial stages, and that the claims against Chapa under Texas law implicate neither statutory nor common law factors favoring federal jurisdiction. In contrast, whether she benefits from sovereign immunity under the Texas Tort Claims Act raises matters of comity and justice that weigh against supplemental jurisdiction; Texas courts are better suited to decide such matters. *See Noble v. White*, 996 F.2d 797, 799 (5th Cir. 1993) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of the applicable law.").

For these reasons, and having concluded that Goodkin's causes of action based on federal law should be dismissed, the Court declines to exercise supplemental jurisdiction over his

defamation claims against Chapa. The Court will dismiss these causes of action without prejudice, allowing Goodkin to present them anew in a Texas state court should he wish to do so.[6]

### III.  Conclusion

For these reasons, it is:

**ORDERED** that Defendants University of Texas Rio Grande Valley and Dr. Diana Chapa's Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. 14) is **GRANTED** to the extent indicated in this Order;

**ORDERED** that Plaintiff Dr. Karl Goodkin's causes of action based on federal law are **DISMISSED WITH PREJUDICE**; and

**ORDERED** that Plaintiff Dr. Karl Goodkin's causes of action based on Texas state law are **DISMISSED WITHOUT PREJUDICE**.

The Court will separately issue a Final Judgment in accordance with this Order and Opinion.

Signed on September 18, 2024.

*Fernando Rodriguez, Jr.*
Fernando Rodriguez, Jr.
United States District Judge

---

[6] Under 28 U.S.C. § 1367(d), the statute of limitations on Goodkin's claims based on state law is tolled "while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." *See also Jinks v. Richland Cnty., S.C.*, 538 U.S. 456, 459 (2003) ("To prevent the limitations period on such supplemental claims from expiring while the plaintiff was fruitlessly pursuing them in federal court, § 1367(d) provides a tolling rule that must be applied by state courts").